UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JAMES MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-0431-JDT-TAB |
| | ) | |
| UNITED PARCEL SERVICE and | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, LOCAL 135, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION**

**FOR IMPOSITION OF RULE 11 SANCTIONS (Docket Nos. 42, 44, 50)[1]**

Plaintiff, James Moore ("Moore"), alleges that his former employer, United Parcel Service ("UPS"), discriminated against him based on his race and retaliated against him in violation of Title VII and § 1981.  Now before the court is UPS's Motion for Summary Judgment (Docket No. 42), Defendant International Brotherhood of Teamsters, Local 135's ("Teamsters") Motion for Summary Judgment (Docket No. 44), and Teamsters's Motion for Imposition of Rule 11 Sanctions (Docket No. 50) against Moore.  After carefully reviewing the parties' briefs and supporting materials, the court finds as follows:

---

[1]  This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

## I.   BACKGROUND[2]

UPS is a large corporation engaged in the package pickup and delivery business. Moore is African-American.  He began working for UPS in 1988.  In 1997, he became a swing package driver for UPS at its 16th Street, Indianapolis, Indiana facility.  (Moore Dep. 14.)  As a swing package driver, Moore did not have a regular route, but rather filled in for package car drivers who were on vacation or otherwise not available.  (*Id.*) Moore was a member of the International Brotherhood of Teamsters, Local 135 and his employment with UPS was governed by the collective bargaining agreement entered into between UPS and Teamsters.  In August 2003, Moore became a Union Steward for Teamsters.  (*Id.* at 42-43.)

Moore mistakenly believed he was on vacation for the week of September 2-5, 2003.  (*Id.* at 78.)  After noticing that his vacation pay was not deposited into his bank account, Moore arrived at work on Tuesday morning, September 2, 2005, to pick up his vacation pay check.  Tina Garber, Moore's immediate supervisor, informed Moore that he was indeed scheduled to work that week and he had a route to drive that day.  (*Id.* at 82, 86-87.)  Garber instructed Moore to go home, get a uniform, and return to work to complete the route.  (*Id.* at 87.)  Moore left the facility between 8:15 and 8:20 a.m.  (*Id.*) On the way to his mother's to change into a uniform, Moore claims that his tire "blew-out".  At some time between 8:26 and 8:30 a.m., before changing the tire, Moore called UPS and informed UPS that he was "having problems" and wouldn't be able to return to

---

[2]  These facts are presented in the light most favorable to Moore, with all reasonable inferences likewise drawn in his favor.

work.  (*Id.* at 89, 91, 94, 146-48.)  The next day, September 3, 2003, Moore called into work at 6:15 a.m. and advised management that he would miss work that day because he hurt his back day changing his blown-out tire from the previous day.  (*Id.* at 98.)  He was asked to call back later that day to speak with Garber.  He called back an hour later and spoke with Garber.  Moore informed Garber that he would miss work that day because he hurt his back.  During this conversation, Moore further explained to Garber that he failed to return to work the previous day because his tire blew-out on his way home to get a uniform.  (*Id.*)  At that point, Garber did not mention job abandonment or any plan to terminate Moore.

Moore returned to work the next day, September 4, 2003.  He was not given a route to run, but was told to talk to Garber.  Garber held a meeting with Moore, UPS Supervisor Darrin Ettner, and Union Steward Scott Mitchell.  At that meeting, Garber terminated Moore for abandoning his job.  (*Id.* at 102, 105.)  Moore asked Garber what he specifically did that constituted job abandonment.  Garber replied, "Well, you didn't show up to work."  (*Id.*)  During the meeting, Moore turned to the Union Steward and said, "Scott, these are a lot of fucking lies."  (*Id.* at 104.)  At one point during the meeting, Garber asked Moore to stop writing.  Moore claims that he placed the pen down and it rolled off the table.  (*Id.* at 102, 113-14.)  UPS alleges that Moore forcefully hit the table with his hand, causing the pen to bounce off the table and hit a wall.  (Def.'s St. Mat. Facts ¶ 20.)  Afterwards, Garber discussed Moore's behavior at the meeting with UPS Division Manager Mike Kovatch.  Kovatch and Garber decided to include

insubordination as an additional basis for Moore's termination.  (Garber Decl. ¶ 18; Kovatch Decl. ¶ 4.)

Pursuant to the collective bargaining agreement, Moore pursued a grievance challenging his termination.  (Moore Dep. 131.)  A local level hearing was held between UPS management and his union representative on September 17, 2003.  The grievance was not resolved at the local level hearing.  (Higgins Decl. ¶ 5.)  It was next heard by the UPS/Teamsters's joint area counsel panel on November 3, 2003.  The panel denied Moore's grievance and upheld his termination.  (*Id.* ¶ 4.)  Throughout the grievance process, Moore's union representative prevented Union Steward Scott Mitchell from appearing and testifying on Moore's behalf.

Moore had a good attendance record at UPS.  Prior to his discharge on September 4, 2003, Moore had never been disciplined for failure to call in an absence, job abandonment, or any other attendance related issue.  (Moore Dep. 254.)

Prior to his termination, Moore had made several claims that UPS had treated him adversely due to his race.  On January 30, 2003, Moore called the UPS Help-Line to make two different complaints of race discrimination.  (*Id.* at 23-24; Pl.'s Design. Ex. 2.)  First, Moore alleged that UPS Supervisor Doug Souert was discriminating against African American employees.  Second, Moore complained that in July 2002, Caucasian UPS Supervisor Pete Skelly grabbed Moore's arm in violation of UPS's zero tolerance policy prohibiting workplace violence.  UPS management investigated the incident and reprimanded Skelly for his actions, but did not fire him.  According to Moore, UPS

management told Moore that had Moore been the one that grabbed someone's arm, Moore would have been fired.  Pete Hood, UPS's Indiana District Employee Relations Manager, conducted a meeting with the relevant parties to resolve Moore's Help-Line complaints.

On July 30, 2003, Moore again called the UPS Help-Line to complain that Garber had harassed him on the job.  (Pl.'s Design. Ex. 3.)  Moore stated that he had reinjured his knee on July 28, 2003.  The next day, Moore told Garber that he could not run a route due to his hurt knee.  Garber ordered Moore to go to the health clinic and stated, "I hope for your sake, you better be injured."  The clinic examined Moore and issued work restrictions.  Garber questioned the clinic's medical assessment and arranged another examination for the next day.  Again, the clinic issued work restrictions.  Still believing that Moore was not truly injured, Garber reviewed UPS's policy on workers compensation fraud with Moore.  In resolving this complaint, Pete Hood ordered Garber to review the company's workers compensation fraud policy with all of the workers she supervises.

During the summer of 2003, Moore began wearing his hair in braids.  Garber told Moore that wearing his hair in braids was "too ethnic, too black" and required that he wear a UPS hat.  (Moore Dep. 134, 185.)  UPS dress policy requires that hair not be worn below the neckline.  Moore's hair was not below the neckline.  Moore alleges that UPS package driver Steve McKinney is Caucasian and wore his hair longer than UPS guidelines permitted; yet, Moore never observed Garber make any comments to McKinney regarding his hair.  (*Id.*)

Finally, Moore also believes that UPS supervisor Doug Souert harassed him on the basis of race.  Souert, who worked with Moore for over six months, repeatedly called Moore by the wrong name because Moore reminded him of a black man he knew with the name "Dave".  (*Id.* 32-33.)

On May 4, 2005, UPS and Teamsters filed separate motions for summary judgment against Moore.  On July 5, 2005, Teamsters filed a motion for Rule 11 sanctions against Moore and counsel.  On July 6, 2005, Moore filed his response brief in opposition to UPS's motion for summary judgment.  In his brief, Moore stated that it would not be challenging Teamsters's motion for summary judgment, abandoning all claims against Teamsters and the § 301 claims against UPS.  On August 11, 2005, UPS filed its reply brief in support of its motion for summary judgment.  On August 12, 2005, Moore filed his response brief in opposition to Teamsters's motion for Rule 11 sanctions.  While Moore has not filed a sur-reply in opposition to UPS's motion for summary judgment and Teamsters has not filed a reply in support of its motion for sanctions, the allotted time for filing such briefs has elapsed.  Thus, the motions are now ripe for the court's review.

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other

materials demonstrate that there exists "no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The court considers those facts that are undisputed and views additional evidence, and

all reasonable inferences drawn therefrom, in the light most reasonably favorable to the

nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195

F.3d 333, 337-38 (7th Cir. 1999). However, once a properly supported motion for

summary judgment is made, the non-movant "cannot rest on the pleadings alone, but

must identify specific facts to establish that there is a genuine triable issue." *Donovan v.

City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994); *see* Fed. R. Civ. P. 56(e).


## III.   MOORE'S RACE DISCRIMINATION CLAIM

Moore alleges that UPS terminated his employment in violation of Title VII and   §

1981 because of his race. Title VII of the Civil Rights Act of 1964 makes it unlawful for

an employer "to fail or refuse to hire or to discharge any individual with respect to his

compensation, terms, conditions or privileges of employment, because of such

individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons

within the jurisdiction of the United States shall have the same right . . . to make and

enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. To avoid

summary judgment on his race discrimination claim under Title VII or § 1981, Moore

must show direct evidence of discriminatory motive or intent or rely on the indirect

burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). *See Bio v. Fed. Ex. Corp.*, No. 04-2849,  — F.3d —, 2005 WL 2241001 (7th

Cir. 2005).  Moore chooses to utilize the indirect burden-shifting method.  (Resp. 16.)

To establish a prima facie case of discrimination under this approach, a plaintiff

must present evidence that, if believed by the trier of fact, would show: 1) he was a

member of a protected class; 2) his performance met his employer's legitimate

expectations; 3) he suffered an adverse employment action; and 4) he was treated less

favorably than similarly situated employees who are in a different class.  *Brummett v.*

*Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005); *Bio*, 2005 WL 2241001,

at *4.  If the plaintiff meets this burden, the burden shifts to the employer to articulate a

legitimate and non-discriminatory reason for the employment action.  If the employer

does so, the plaintiff must show that the proffered reasons are a pretext for

discrimination.  "If the plaintiff meets his respective burdens under *McDonnell Douglas*,

summary judgment is inappropriate."  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886

(7th Cir. 2001).

Not all elements of the prima facie case are at issue.  The parties do not dispute

that Moore belongs to a protected class or that he suffered an adverse employment

action.  Instead, in determining whether Moore has established a prima facie case, the

court must only consider 1) whether Moore was meeting the legitimate expectations of

UPS at the time of his discharge, and 2) whether similarly situated employees outside

the protected class were treated more favorably.  Because the "issue of satisfactory job

performance often focuses on the same circumstances as must be scrutinized with

respect to the matter of pretext," *Gordon*, 246 F.3d at 886, the court will address the

legitimate expectations prong of the analysis when it discusses pretext and assume, for the prima facie analysis, that Moore was meeting UPS's legitimate expectations. However, the court will note that prior to his discharge, Moore had never been written up or disciplined for any attendance related issue.  But before the court can discuss pretext, it must first address whether Moore has satisfied the similarly situated employee prong of the analysis.

"A plaintiff may meet the fourth prong of the *McDonnell Douglas prima facie* case by demonstrating a genuine issue of material fact on whether he was treated less favorably than similarly situated employees outside of his protected class."  *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)).  Moore claims that Brad Smith, a Caucasian former UPS package car driver, is similarly situated to himself.  As evidence, Moore presents Smith's affidavit which sets forth that Smith missed numerous days, many of which were "no call, no show" absences, and that UPS gave Smith multiple warnings and additional opportunities to correct his poor attendance habits prior to his eventual discharge. (Smith Aff. ¶¶ 2-12.)  UPS argues that Smith is not similarly situated to Moore because they "did not have the same supervisor and committed different acts."  (Reply 19.)

In determining whether employees are similarly situated, the court must look at all relevant factors, the number of which depends on the context of the case.  *Ezell*, 400 F.3d at 1049 (citing *Peele*, 288 F.3d at 330).  In disciplinary cases, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications, and conduct.  *Id.*  "This normally entails a showing that the two employees dealt with the

same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* at 1050.   However, the Seventh Circuit does not require Moore to produce a Caucasian employee with an entirely identical situation: "the law is not this narrow; the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated."  *Id.*  First, Moore's immediate supervisor was Garber.  But Garber, alone, did not make the decision to terminate Moore.  Instead, the decision was made by both Garber and Kovatch, the Division Manager.  While Garber was not Smith's immediate supervisor, Garber was involved with managing Smith's misconduct.  (Smith Aff. ¶¶ 8, 11.)  But more importantly, the decision to terminate Smith was ultimately made by the Kovatch (*id.* ¶ 12), the same Division Manager that ultimately authorized Moore's termination.

UPS also argues that Moore and Smith are not similarly situated because they were terminated for different reasons.  Again, while the reasons for termination were not identical, the evidence produced demonstrates strong similarities between the two.  Smith began his employment with UPS in 1993, and became a driver in 1999.  Smith was absent "several days" during 2000, with at least "two absences no call, no shows."  (Smith Aff. ¶ 3.)  He received no discipline for these absences.  (*Id.*)  On August 8, 2001, Smith called-in after his start-time and told his supervisor that he would be absent because of car trouble.  When asked what kind of car trouble he was having, Smith hung up.  (*Id.* ¶ 4.)  Smith received only a verbal warning for this conduct.  (*Id.*)  Smith missed a total of seven days of work from January 24, 2003 to July 7, 2003.  (*Id.* ¶ 5.)

Kovatch gave Smith a warning letter threatening termination if his attendance did not improve.  (*Id.*)  Smith was a "no call, no show" on November 25 and 26, 2003.  (*Id.* ¶ 6.)  He received a verbal warning threatening termination.  (*Id.*)  After three consecutive "no call, no shows" in January, 2004, Kovatch terminated Smith.  (*Id.* ¶ 8.)  However, Kovatch decided to give Smith another chance and told him to return to work on January 15, 2004.  (*Id.* ¶ 9.)  At the beginning of February, 2004, Smith first informed UPS of a drinking problem and UPS allowed Smith time-off to seek treatment.  (*Id.* ¶ 10.)  After Smith failed to return several phone calls from UPS management in March through May, 2004, UPS gave Smith the option of resigning or being terminated.  (*Id.* ¶ 12.)  On June 2, 2004, Smith resigned.  (*Id.*)  This evidence demonstrates that Smith had continual problems with his attendance, including multiple absences and multiple "no call, no shows."  In response, UPS gave Smith multiple warnings and opportunities before ultimately terminating his job.  In contrast, UPS terminated Moore for calling in the absence on Tuesday, September 2, 2003.  Despite Moore having no history of attendance problems, UPS did not give him a warning or a second opportunity.  UPS attempts to distinguish Moore's conduct from Smith's by noting that Moore called-in his absence after he was specifically ordered to go home, get a uniform, and come back.  While the court agrees this conduct is not identical to Smith's absences, it is sufficiently similar to Moore's conduct to satisfy the fourth prong of his prima facie case.  Likewise, the evidence produced by Moore creates a genuine issue as to whether Smith was treated more favorably than Moore.  Thus, for purposes of opposing summary judgment, Moore has satisfied the fourth prong of the prima facie case.

Once the plaintiff has established his prima facie case, the employer may articulate a legitimate, non-discriminatory reason for the adverse employment action. Here, UPS provides two reasons for Moore's termination: 1) job abandonment, and 2) insubordination. Moore must then establish "that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination . . . in order to survive summary judgment." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). In order to demonstrate a material issue of fact as to pretext, Moore must show "that either 1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible." *Id.* (citing *Guerrero v. Ashcroft*, 253 F.3d 309, 313 (7th Cir. 2001)). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).

The court will first address UPS's proffered reason of job abandonment. Neither party disputes that pursuant to the collective bargaining agreement, job abandonment constitutes grounds for immediate termination. (Def.'s St. Mat. Facts ¶ 24; Resp. ¶ 24.) However, Moore disputes that his absence constituted job abandonment and that UPS would not have characterized his conduct as job abandonment if he were Caucasian. The court finds that Moore has produced sufficient evidence to demonstrate a material issue of fact as to pretext. First, the evidence proffered suggests sufficient doubt as to whether UPS has a basis for characterizing Moore's conduct as job abandonment. The

parties agree that job abandonment is, among other things, the failure of an employee to report to work for three consecutive working days where the employee does not properly notify management at the beginning of the workday.  (Reply ¶ 16.)  However, UPS also argues that Moore's conduct in calling in an absence after he had been ordered to return to work constitutes job abandonment.  However, UPS fails to point to a policy, guideline, or any other evidence in support of this allegation.  Of course, it is the duty of every employee to show up for work, whether expressly told to do so or not.  However, common sense dictates that, for one reason or another, there are times when employees cannot avoid absences.  Here, Moore alleges that he called-in an absence on September 2, 2003, because he blew-out his tire and wouldn't be able to return to work.  The next day, Moore personally explained to Garber why he was unable to return to work.  However, because Garber did not believe the excuse, as she alleges, Kovatch and Garber terminated Moore on September 4, 2003, for job abandonment.  The question is whether Garber's belief was honest or pretextual.

The court finds that Moore has proffered sufficient evidence to create a genuine issue as to Garber's sincerity.  First, Moore indicates that since he began working for UPS in 1988, he has no history of violating UPS's attendance policies or of calling in and giving a false excuse for his absence.  (Moore Dep. 254.)  Second, Garber knew of Moore's excuse on September 3, 2003, prior to terminating Moore, and never confronted Moore regarding the validity of his excuse.  Third, Smith, a Caucasian driver, had a history of poor attendance, including "no call, no shows" and hanging up on his supervisor when asked what kind of car problems he was experiencing; yet, Smith was

given multiple warnings and second opportunities.  UPS failed to give Moore similar warnings regarding his "job abandonment."  Thus, Moore has produced sufficient evidence to raise a genuine issue as to UPS's first reason for terminating Moore.

In addition, UPS provided insubordination as a second reason for terminating Moore.  However, this reason is also questionable as to its sincerity.  UPS originally terminated Moore for job abandonment.  However, due to his alleged behavior at his termination meeting, UPS subsequently amended Moore's termination letter to include insubordination as a second reason for his termination.  The court notes that Kovatch and Garber had already determined to terminate Moore prior to the September 4, 2003, termination meeting.  Logically, Moore's conduct at the meeting, whether it constituted insubordination or not, could not have been a cause for his termination, as the decision to terminate Moore had already been made.  Because the alleged acts of insubordination took place subsequent to the decision to terminate Moore, the court accordingly draws the inference in Moore's favor, for purposes of the summary judgment analysis, that the insubordination reason was pretextual.

Accordingly, the court finds that Moore has produced sufficient evidence to establish his prima facie case and to raise a genuine issue as to whether the employer's proffered reasons are merely pretext.  UPS's motion for summary judgment is DENIED to the extent it seeks to dismiss Moore's claim of race discrimination.

## IV.    MOORE'S RETALIATION CLAIM

Claims of retaliation, like claims of race discrimination, can be proven either directly or indirectly.  *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004).  Moore chooses to utilize the direct method of proof.  (Resp. 26.)  In order to survive summary judgment using the direct method, "the plaintiff must present direct evidence of 1) a statutorily protected activity; 2) an adverse employment action taken by the employer; and 3) a causal connection between the two."  *Id.* (quoting *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)).  Again, neither party disputes that Moore's termination constituted an adverse employment action.  However, the parties dispute prongs one and three.

Moore produces direct evidence that he engaged in a statutorily protected activity.  For purposes of a retaliation claim, a statutorily protected activity may consist of an internal complaint of race discrimination and harassment whether or not the employer had actually violated Title VII prior to the complaint.  Indeed, "[a]n actual violation of Title VII by the employer is not a prerequisite for a retaliation claim; the employee need only have a sincere and reasonable belief that she is challenging conduct that violates Title VII."  *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997).  On January 30, 2003, Moore called the UPS help-line and made two complaints of race discrimination against UPS.  On July 30, 2003, Moore called the UPS help-line and made a complaint that Garber subjected Moore to harassment in the workplace.  These calls act as sufficient evidence that Moore engaged in statutorily protected activity.

-15-

The more difficult question is whether Moore has produced sufficient direct evidence to show a causal connection between his statutorily protected activity and his termination. "Direct evidence" can be "an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that directly points to a discriminatory intent." *Davis*, 368 F.3d at 786. Moore first points to the short lapse of time between his two internal complaints to the UPS Help-Line and his termination. "Although a short period of time between the filing of a charge of discrimination and an allegedly retaliatory action is rarely enough by itself to create a triable issue, *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), the timing of events 'is often an important evidentiary ally of the plaintiff.'" *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). "Close temporal proximity provides evidence of causation, and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." *Id.* (citations omitted). Here, Moore called the UPS Help-line on January 30, 2003 and July 30, 2003, and alleged that he was subjected to harassment in the workplace. Specifically, the July 30, 2003 complaint alleged that his supervisor, Garber, was harassing him. A little over a month later, on September 2, 2003, Garber recommended that UPS terminate Moore. The close temporal proximity between Moore's complaints and his termination creates, at the least, a suspicion of causal connection between the two events.

But the temporal connection alone is insufficient to satisfy the causal connection prong of the direct case for retaliation. However, Moore has also offered evidence that

Garber began harassing Moore in August 2003 regarding the way Moore styled his hair. Moore had braided his hair and placed beads in his braids. Garber disapproved of the style, telling Moore that it was "too ethnic, too black." (Moore Dep. 134, 185.) Garber required that Moore wear a hat on his route. The UPS dress code does not expressly disapprove of braided or beaded hair.[3] Moore's evidence regarding Garber's comments on his hair and the requirement that Moore wear a hat to cover it up, coupled with the close temporal proximity between Moore's complaint and his termination, is sufficient at the summary judgment stage to show a causal connection between Moore's statutorily protected activities and his termination. Accordingly, UPS's motion for summary judgment is likewise DENIED to the extent it seeks to dismiss Moore's retaliation claim.

## V.   RULE 11 SANCTIONS AND § 301 CLAIMS

The basic purpose of Rule 11 "is to deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). The rule requires an attorney to certify that he has conducted a reasonable inquiry under the circumstances and that any paper filed with the court is not presented for an improper purpose and the allegations and contentions are well grounded in fact and legally tenable. *Id.* A court may impose sanctions for making arguments or claims "'that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose.'" *Indep. Lift Truck Builders Union v. NACCO Materials Handling Group, Inc.*, 202 F.3d 965, 968-

---

[3] Instead, it prohibits hair below the neckline. Moore's hair did not fall below the neckline, yet Garber required him to wear a hat. On the other hand, Moore has offered evidence that a Caucasian driver, Steve McKinney, was permitted to wear his hair below his neckline without being required to wear a hat. (Moore Dep. 56-61.)

69 (7th Cir. 2000) (quoting *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998)).  An

argument or claim is frivolous if it is "baseless and made without a reasonable and

competent inquiry."  *Id.*  Rule 11 sanctions "are to be imposed sparingly."  *Hartmarx

Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003).

Teamsters asks the court to impose Rule 11 sanctions on Moore and his

counsel.  While Moore's claims against Teamsters may have been weak, the court is

not convinced that they were frivolous.  Regardless, Rule 11 contains a "safe-harbor"

provision requiring a party seeking sanctions to give the opposing party a twenty-one

day fair warning period.  On June 13, 2005, Teamsters served Moore's counsel with its

Rule 11 Motion for Sanctions.  On July 1, 2005, prior to the expiration of the safe-harbor

period, Moore's counsel contacted Teamsters counsel, Attorney Fred Towe, and

requested that, pursuant to Federal Rule of Civil Procedure 41(a)(1), the parties enter a

joint dismissal of Moore's claims relating to Teamsters.  Due to the upcoming holiday

weekend, Attorney Towe was unable to secure the necessary authorization to enter into

the joint stipulation suggested by Moore's counsel.  Accordingly, Teamsters filed its

motion for sanctions on July 5, 2005.  However, on July 6, 2005, Moore filed his

Response in Opposition to UPS's motion for summary judgment, which contained a

footnote informing the court that Moore would not pursue his § 301 claims against UPS

and Teamsters.

In addition, this court has previously observed that in certain instances, "winning

ought to be enough for the Defendant.  There is no need to scorch the field on which the

battle was fought."  *McDaniel v. Eaglecare, Inc.*, IP 00-0413-C-T/K, slip op. at 7 (S.D.

Ind. Sept. 27, 2002).  Here, Moore does not oppose Teamsters's motion for summary judgment.  Indeed, Moore has abandoned its claims against Teamsters.  Because Moore attempted to enter into a joint stipulation to dismiss its claims against Teamsters and because Moore has abandoned its claims against Teamsters, the court will GRANT Teamsters's motion for summary judgment and DENY Teamsters's motion for Rule 11 sanctions.  Likewise, because Moore abandoned his § 301 claims, the court will GRANT UPS's motion for summary judgment to the extent it seeks to dismiss Moore's § 301 claims against UPS.

### VI.    CONCLUSION

For the foregoing reasons, Defendant UPS's Motion for Summary Judgment (Docket No. 42) is **GRANTED** on Count G of Plaintiff's First Amended Complaint. However, the motion for summary judgment is **DENIED** with respect to Counts A, B, and C.

Defendant Teamsters's Motion for Summary Judgment (Docket No. 44) is **GRANTED** with respect to Counts D, E, and F of Plaintiff's First Amended Complaint. However, Teamsters's Motion for Rule 11 Sanctions (Docket No. 50) is **DENIED**.

### VII.    CONCLUSION

For the foregoing reasons, Defendant UPS's Motion for Summary Judgment (Docket No. 42) is **GRANTED** on Count G of Plaintiff's First Amended Complaint.

However, the motion for summary judgment is **DENIED** with respect to Counts A, B, and C.

Defendant Teamsters's Motion for Summary Judgment (Docket No. 44) is **GRANTED** with respect to Counts D, E, and F of Plaintiff's First Amended Complaint. However, Teamsters's Motion for Rule 11 Sanctions (Docket No. 50) is **DENIED**.

ALL OF WHICH IS ENTERED this 7th day of October 2005.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Michael Anthony Bray
Haskin Lauter Larue & Gibbons
mbray@hlllaw.com

Gary R. Clark
Quarles & Brady, LLP
gclark@quarles.com

Ellen M. Girard
Quarles & Brady LLP
egirard@quarles.com

John A. Klages
Quarles & Brady LLC
jk2@quarles.com

Denise K. LaRue
Haskin Lauter Larue & Gibbons
dlarue@hlllaw.com

Geoffrey S. Lohman
Fillenwarth Dennerline Groth & Towe
glohman@fdgtlaborlaw.com

Fred O. Towe
Fillenwarth Dennerline Groth & Towe
ftowe@fdgtlaborlaw.com

D. Scott Watson
Quarles & Brady LLP
dsw@quarles.com

Magistrate Judge Tim A. Baker